## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**STEVE CAVANAUGH LIMITED PARTNERSHIP,**

Case No. **08-61002-11**

Debtors.

### *MEMORANDUM OF DECISION*

At Butte in said District this 1st day of June 2009.

Four (4) motions to modify stay (Docket Nos. 86, 87, 88 and 89) filed by secured creditors who are named below, and the Debtor-in-Possession's ("DIP") objections thereto are pending in this Chapter 11 case. The Court held a hearing on these 4 consolidated motions after notice at Missoula on May 7, 2008. The parties appeared represented by counsel. Attorney James A. Patten ("Patten") of Billings, Montana, represented the DIP. Attorney William E. Hileman, Jr. ("Hileman") of Whitefish, Montana represented the moving creditors. DIP's principal partner Steven Cavanaugh ("Cavanaugh") testified, as did MAI appraisers J. Michael Joki ("Joki") and Dennis C. Hoeger ("Hoeger") regarding the value of the creditors' collateral, which consists of vacant lots. Exhibits ("Ex.") 1 through 19, A, C, and D were admitted into evidence without objection. After the conclusion of the parties' cases-in-chief the Court took the 4 motions to modify stay under advisement. After review of the record and applicable law, for the reasons set forth below the creditors' motions to modify stay will be granted by separate Orders.

The DIP filed its Chapter 11 petition on July 25, 2008. This Court has original and

1

exclusive jurisdiction of this Chapter 11 bankruptcy case under 28 U.S.C. § 1334(a).  The

contested motions to modify stay are core proceedings under 28 U.S.C. § 157(b)(2)(G).  This

Memorandum includes the Court's findings of fact and conclusions of law.

The 4 pending motions to modify stay each were filed on March 19, 2009, by the

following creditors:  Donald and Janette Neu ("Neu") (Proofs of Claim Nos. 1 and 2) (Docket

No. 86); Essex Ventures, LLP, Quality Supply, Inc. PSP&T, Ashcraft and Moreland MP, PC

EPSP, J & MC, LLP, Janice Elliott, Trip Lumber Company, Inc. ERP, and The Weeks Alaska

Community Property Trust (together "Essex 400") (Claim No. 3) (Docket No. 87); Essex

Ventures, LLP, Quality Supply, Inc. PSP&T, Ashcraft and Moreland MP, PC EPSP, J & MC,

LLP, Stephen S. Ellis, MC, PC, Stanley N. Smith, Barbara L. Simonsen, Russell Brooks and

Grace Brooks ("Essex 500") (Claim No. 4) (Docket No. 88); and by Thomas H. Boone, Trustee

of the Boone Karlbert EPST, Essex Ventures, LLP, Quality Supply, Inc., PSP&T, Tripp Lumber

Company, Inc. ERP, Stephen S. Ellis, MD, PC ERP, Wells & McKittrick, PC 401k Retirement

Plan, Peterson Investments of Missoula, LLC, and Lawson Lowe 401k Retirement Plan ("Boone

600") (Claim No. 5) (Docket No. 89).

All 4 motions are based upon 11 U.S.C. § 362(d)(1) and (d)(2).  The DIP filed objections

to each of the 4 motions to modify stay on March 27, 2009 (Docket Nos. 97, 98, 99 & 100).

Each objection states that the DIP has equity in the respective collateral, the collateral is

necessary for the DIP's effective reorganization, and the DIP is willing to pay adequate

protection to the creditors if the Court determines that an inadequate equity cushion exists.

DIP filed a Chapter 11 Plan on January 15, 2009, with a disclosure statement.  Several

objections have been filed to the plan and disclosure statement.  The DIP was granted until June

5, 2009, to file an amended disclosure statement, and the hearing on approval is set for June 16,

2009.

## FACTS

Steve Cavanaugh is a real estate developer and principal partner in the DIP.  He testified that he has been involved in 2 or 3 real estate developments in his career.  The 4 pending motions to modify all involve the DIP's development known as the Rolling Glen Ranch ("RGR") residential subdivision located in Broadwater County, 9 miles north of Three Forks, Montana, and northwest of the junction of Interstate 90 and Highway 287.

Hoeger testified that RGR is 640 acres in size divided into 126 lots of approximately 5 or 6 acres each, which are considered "horse properties" because of their size.  He described the homes on some of the RGR lots as very nice, and photographs of some of the homes in RGR are in Ex. D.  The entrance to RGR is from Price Road, but the roads inside RGR are gravel, not paved.  Cavanaugh testified that he installed 6 miles of 3-rail fence in and around RGR, spent $30,000 planting perennial wildflowers on all 640 acres, drilled test wells, and so far has invested $2.5 million developing RGR.

Cavanaugh testified that the RGR subdivision master plan contemplates extensive improvements, including two golf courses.  He testified that his partnership received preliminary approval of the RGR master plan from Broadwater County in 2007, but that he purposely held off from marketing RGR lots until the golf courses are built, and that they sold only what they needed to sell in 2007.  In 2008 Broadwater County suspended final approval of the RGR master plan, and Cavanaugh testified that as a result of the suspension they did not sell lots in 2008.  Ex. A, p. 22, states that the revocation has been reversed and the developers of RGR are able to market and sell lots again.  When the golf courses are built, Cavanaugh testified, the lots in RGR will sell, but until then he sells only what he needs to sell.

Cavanaugh testified that the golf course amenities have not been completed, that he needs an additional $354 million in capital to develop the master plan over 40 years. When asked if he has access to capital to develop the master plan Cavanaugh answered: "No.". Cavanaugh testified that, although the partnership spent $500,000 drilling its own wells for the golf courses, it currently does not own sufficient water rights, and would have to pay the town of Townsend $250,000 to purchase additional water shares. Hoeger testified that the amenities are not being developed, and may never be.

Cavanaugh testified that the real estate taxes on RGR are not current. In addition he testified that he agreed in writing to pay $10,500 per lot to Broadwater County for improvements which he has not paid and which he disputes[1].

Other subdivisions located nearby RGR include "Wheatland Meadows" ("Wheatland") which is located to the southwest of RGR, Morning Sky Estates[2], Quiet Subdivision[3], Mountain Vista, and Eagle Ridge next to RGR on the north. Morning Sky Estates and Quiet Subdivision lots are from 4 to 6 acres in size and have homes similar in quality to those in RGR. Mountain Vista's lots are smaller than RGR's lots, only one or two acres. Eagle Ridge and Wheatland both have paved roads and starter homes. Joki testified that he did not consider sales in Eagle Ridge because they were 1 acre lots that are selling for $38,900, and in his opinion it is not appropriate to take 1 acre lots and simply multiply by a factor of 5 to compare to RGR lot values. However,

---

[1]He testified that the DIP is in litigation against Broadwater County. Adversary Proceeding Nos. 08-00059 and 08-00060 both are pending on Broadwater County's motion to remand to state court, with hearings set in both adversary proceedings for July 14, 2009.

[2]Morning Sky Estates is located southeast of RGR, and approximately 1.5 west of Highway 287. Ex. A, p. 30.

[3]Quiet Subdivision is located approximately 2.8 miles east of Highway 287. Ex. A, p. 30.

4

he testified that Eagle Ridge has very similar views as RGR, has water, and that the roads in Eagle Ridge are paved.

Hoeger testified that Wheatland generally has smaller lots and smaller houses than RGR, and that 5 acre lots usually demand a nicer home, but that Lot 38 on Wheatland has a house in construction which is similar in quality to RGR. Joki testified that Wheatland has smaller, less expensive homes that the homes on RGR, and that Eagle Ridge has smaller starter homes similar to Wheatland. While Wheatland includes some lots up to 3 acres in size which are considered horse properties, other Wheatland lots are 1 acre in size. Hoeger testified that more people can afford smaller lots such as those offered by surrounding subdivisions than can afford the larger lots offered by RGR, as the greater number of acres means higher cost.

Hoeger testified that commercial lots exists on each side of Wheatland, but they are separated by a ridge[4]. A Wheat Montana bakery and processing facility is approximately 1 mile south of Wheatland, but Hoeger testified that it has no effect on the value of lots in Wheatland. Hoeger testified that Wheatland has two entrances, one off of Highway 287 through a commercial site, and the second off of Wheatland Road[5]. The entrances into Wheatland are gravel roads, but the interior roads are paved. Ex. C. Cavanaugh offered Ex. C and D to show that the entrance to RGR is a "whole different environment."

Cavanaugh testified that entry into Wheatland requires one to drive by a self-storage business and a truck repair business. Ex. C. He testified that Ex. C shows that homes built in Wheatland are not in compliance with covenants and subdivision regulations regarding decks,

---

[4]Hoeger answered "No" when asked whether a large cattle sales barn was adjacent to Wheatland, and explained that the stockyard is a half mile away.

[5]Ex. C is comprised of photographs taken by Cavanaugh's wife of Wheatland's entrances, nearby businesses including a cattle yard, and some homes and yards.

5

porches, dog kennels, and fences, and that Wheatland's developer is not enforcing the covenants and regulations. Cavanaugh explained that enforcement of covenants and regulations enhances the value of a subdivision, and keeps the developer out of lawsuits. He testified that Eagle Ridge next to RGR is more comparable, and that Eagle Ridge tries to enforce its covenants.

**Market Testimony.**

Hoeger testified that a massive reduction in the real estate market near Three Forks occurred during the last 18 months since 2007, and a massive reduction of sales of residential lots in which sales activity in 2008 came almost to a stop, resulted in a reduction of market values. Joki agreed that values of real estate have decreased in the last 18 months, and that he did not have actual 2008 sales so had to use listing prices in Ex. A, pp. 24-25, in evaluating market conditions.

Hoeger testified that currently 76 lots are available for sale in Wheatland for a total asking price of $1,850,000, or approximately $24,000[6] per lot, at listing prices about half what they were. He testified that sales in the year 2008 in Wheatland subdivision were for an average 67 percent (67%) below the asking price, at a range of discounts between 71% and 30%. Ex. 16, pages 23-24[7].

Hoeger testified that 5-acre lots in Wheatland listed for $90,000 sold for $30,000 and $33,000 in late 2008. Ex. 16, page 24[8]. Joki testified that lots in Wheatland sold for $16,000 in

---

[6]$1,850,000 divided by 76 equals $24,342.11 per lot.

[7]The same "Market Analysis and Observations" section at Ex. 16, pp. 23-26, is found at Ex. 17, pp. 26-29, Ex. 18, pp. 27-30, and at Ex. 19, pp. 30-33. For brevity the Court will refer to Ex. 16 except where there are specific differences.

[8]Lots 34 and 38 in Wheatland reflected a decrease of 67% between listing and sale price.

January 2009[9].  Hoeger testified that he was concerned that those sales in Wheatland might be "fire sale" prices, and that he spoke to Wheatland's developer who told him that he lowered the prices to generate cash by the end of the year.  Hoeger testified that the sales of Wheatland lots in late 2008 and 2009 were not isolated sales, but that no subsequent sales of Wheatland lots occurred at higher prices, from which he concluded that the sales of Wheatland lots in late 2008 and 2009 were not fire sale prices but instead reflected a new, lower market.  If higher subsequent sales had occurred, Hoeger testified, he would have concluded that the sales of Wheatland[10] lots in 2008 and 2009 were fire sales.

Joki testified that he was suspicious about the sales of Wheatland lots in late 2008 and 2009 because the sale prices were so low.  Joki did not agree that those sales reflect market value, and he testified that the Wheatland sales involved a willing buyer and a seller who wanted quick cash, which is not Joki's definition of market value[11].  Joki contacted Wheatland's developer, and attached the reply letter to Ex. A in the addenda.  Joki testified that the Wheatland developer agreed to sell five lots for cash at a quick closing to a single builder, at below market value, in order to pay down debt.  Joki testified that no other developers are reducing listing prices like Wheatland's, and that after analyzing the data he concluded the sale of Wheatland lots

---

[9]Lot 113 sold for $16,500 in December 2008, and Lot 84 sold in January 2009 for $22,000. Ex. 16, p. 24.

[10]He testified that Wheatland is currently listed for sale as a "bulk sale," while RGR is not offering bulk sales but rather only individual lots for sale.

[11]Ex. A, p. 10, provides a definition of market value as: "The most probable price . . . in cash, or . . . equivalent . . . for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self interest, and assuming that neither is under undue duress."  Further conditions include: "5.  The price represents the normal consideration of the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with this sale."

in 2008 and 2009 were an "isolated incident" and he did not consider those sales any further.  Ex. A, pp. 25-26.  Joki testified that current sales in Eagle Ridge are comparable to the sales in Wheatland in size, and comparable to Wheatland's listing prices.  Joki testified that if he included the Wheatland sales it would increase his adjustment and decrease his opinion of the value of the secured creditors' collateral.

Hoeger testified that recent developments since February 2009 support his conclusion that land values near Three Forks are now lower, in order to attract buyers.  He testified that 8 sales have closed on lots in the area in the past year.  He testified that gasoline prices are rising again, which hurts sales of RGR property in the Bozeman market, and that he knows of realtors taking jobs in retail to make ends meet in the new market.  Joki states in Ex. A, p. 14, that the economy began to slow in 2007 and the sale of vacant lots has significantly slowed since then, that an oversupply of vacant lots currently exist in the area, and because of RGR's relatively remote location he expects sales activity to remain sluggish as long as the overall economy remains sluggish.

Joki testified that 3 sales of 1-acre lots in Eagle Ridge in 2009[12] have closed for prices around $38,900, only slightly less than Hoeger's value for 5-acre lots in RGR.  He admitted that the fact Eagle Ridge's roads are paved impact their value, but testified that the recent sales of Wheatland lots are not affecting Eagle Ridge values.  Hoeger testified that he did not consider the comparable sales in Eagle Ridge used by Joki because he felt he had enough sales data.

One sale of a lot in RGR which is reflected in Joki's appraisal, Ex. A, but not in Hoeger's appraisals, is the pending sale of Lot 120.  Lot 120 is a 5.31 acre lot in RGR with a sale pending

---

[12]Joki testified that Eagle Ridge did not exist in 2007.

8

as of March 29, 2009, in the amount of $93,500[13], which is Comparable Sale No. 1 in Ex. A, pp. 28, 29. The sale of Lot 120 is the most current sale, but the sale is contingent on confirmation of the DIP's Chapter 11 Plan and completion of this bankruptcy proceeding. Ex. A, p. 29. Before the sale of Lot 120, Hoeger testified, the last sale of a lot in RGR was in September of 2007.

Hoeger testified that he spoke with the buyers of Lot 120, and they told him that they had already purchased Lot 107, which adjoins Lot 120, and they purchased Lot 120 for their parents to build on and move in next door. Hoeger testified that the purchasers of Lot 120 were motivated by the proposed amenities to RGR, but that those amenities are not present now and may never happen. Hoeger testified that the sale of Lot 120 did not change his opinion since that sale has not closed, that "one sale doesn't make the market," and that a subdivision development cannot be sustained with one sale every 18 months. If the DIP makes more sales in RGR at higher prices, Hoeger testified, then he will admit that the values in RGR are greater but until more sales occur he thinks the sale of Lot 120 in RGR is an aberration. Joki admitted that closing of the sale of Lot 120 is awaiting the decision on DIP's Plan, but that even if the sale of Lot 120 does not close he still feels that his value conclusions are reasonable given the range of RGR lot sales in 2007, Comparable Sales 2, 3, 4 and 5. Ex. A, pp. 28-29.

Hoeger concluded that the market reflects a 55% reduction in lot values since 2007. Ex. 16, p. 24. Joki concluded that the market conditions reflect a 25% reduction in values from 2007 sales. Ex. A, p. 26.

**The Pending Motions.**

Neu filed their motion to modify stay (Docket No. 86) on March 19, 2009, claiming security interests in Lots 11, 13, 44 and 47 in RGR. Neu's motion states the market value of Lots

_____

[13]Joki testified that $1,000 in earnest money has been deposited on Lot 120.

11 and 13 as $87,500 per Hoeger's appraisal, Ex. 16, and the value of Lots 44 and 47 as $80,000. Neu's motion alleges that the Debtor is in default of all payments due since January 1, 2008, and bases their motion on §§ 362(d)(1) and (d)(2). DIP's objection (Docket No. 98) does not contest Neu's allegation of the DIP's default, does not include an estimation of the value of Neu's collateral asserted by Neu, and does not state with specificity the adequate protection offered to be provided other than stating the "Debtor is willing to pay adequate protection to the creditor in the event this Court determines there is not an adequate equity cushion in the collateral." Neu filed Proofs of Claim Nos. 1 and 2 on September 3, 2008, asserting secured claims and including notes and trust indentures. No objection to Neu's claims have been filed by the DIP, and DIP's objection to Neu's motion does not state with particularity any objection to the existence, validity or any other aspect of Neu's secured claims.

Essex 400's motion (Docket No. 87) is similar to Neu's motion in that it alleges that the Debtor is in default of all payments due since August 1, 2008, and bases their motion on §§ 362(d)(1) and (d)(2). Essex 400 claim security interests in Lots 19, 78, 80, 118, 119, 120 and 125 in RGR and state their value in the total amount of $272,500 in accordance with Hoeger's appraisal Ex. 17. DIP's objection (Docket No. 97) does not contest Essex 400's allegation of the DIP's default, does not include an estimation of the value of security asserted by Essex 400, and does not state with specificity the adequate protection offered to be provided other than stating that the DIP is willing to pay adequate protection. Essex 400 filed Proof of Claim No. 3 on September 3, 2008, asserting a secured claim and including a note and mortgage. No objection to Essex 400's claim has been filed by the DIP, and DIP's objection to Essex 400's motion does not state with particularity any objection to the existence, validity or any other aspect of Essex 400's secured claim.

Essex 500's motion (Docket No. 88) alleges that the Debtor is in default of all payments due since January 1, 2008, and is based motion on §§ 362(d)(1) and (d)(2). Essex 500 claim security interests in Lots 10, 12, 23, 24, 31, 43, 66, 69, 70 and 73 in RGR and state their value in the total amount of $407,500 in accordance with Hoeger's appraisal Ex. 18. DIP's objection (Docket No. 99) does not contest Essex 500's allegation of the DIP's default, does not include an estimation of the value of security asserted by Essex 500, and does not state with specificity the adequate protection offered to be provided other than stating that the DIP is willing to pay adequate protection. Essex 500 filed Proof of Claim No. 4 on September 3, 2008, asserting a secured claim and including a note and mortgage. No objection to Essex 500's claim has been filed by the DIP, and DIP's objection to Essex 500's motion does not state with particularity any objection to the existence, validity or any other aspect of Essex 500's secured claim.

Boone 600's motion (Docket No. 89) alleges that the Debtor is in default of all payments due since January 1, 2008, and is based motion on §§ 362(d)(1) and (d)(2). Boone 600 claim security interests in Lots 14, 15, 57, 58, 59, 60, 63, 64, 67, 68, 71 and 72 in RGR and state their value in the total amount of $480,000 in accordance with Hoeger's appraisal Ex. 19. DIP's objection (Docket No. 100) does not contest Boone 600's allegation of the DIP's default, does not include an estimation of the value of security asserted by Boone 600, and does not state with specificity the adequate protection offered to be provided other than stating that the DIP is willing to pay adequate protection. Boone 600 filed Proof of Claim No. 5 on September 3, 2008, asserting a secured claim and including a note and mortgage. No objection to Boone 600's claim has been filed by the DIP, and DIP's objection to Boone 600's motion does not state with particularity any objection to the existence, validity or any other aspect of Boone 600's secured claim.

11

In the joint motion to vacate the first hearing scheduled on the pending motions (Docket no. 118), filed by the DIP and the secured creditors, the DIP agreed at page 3:

> 6.   In order to facilitate, expedite and reduce expense associated with the hearings on the stay motions, the DIP does hereby agree for purposes of this hearing and the DIP reserves the right to object to the amounts due in subsequent proceedings:
>
> > (a) The balance owing to Neu as of May 5, 2009 will be $235,198.51;
> > (b) The amount owing to Essex as of May 5, 2009 will be $398,590.34;
> > (c) The amount owing to Essex 500 as of May 5, 2009 will be $582,455.20; and
> > (d) The amount owing to Boone as of May 5, 2009 will be $693,722.55.
> > (e) The promissory note and Montana trust indenture attached to the Neu Proof of Claim [Claim Nos. 1 and 2], the Promissory Note and Mortgage attached to the Essex Proof of Claim [Claim No. 3], the Promissory Note and Mortgage attached to the Essex 500 Proof of Claim [Claim No. 4], and the Promissory Note and Mortgage attached to the Boone Proof of Claim [Claim No. 5] are true and correct copies of the original notes, trust indenture and mortgages and may be received into evidence without further testimony or foundation as evidence of the original promissory notes, trust indenture, and mortgages.

Ex. 1 through 14 are the secured creditors notes, deed, mortgages, and loan payoffs, attached to Docket No. 133.

Also, in the joint motion, filed April 13, 2009, Docket No. 118, the secured creditors agreed to continue the hearing scheduled for April 14, 2009, until May 7, 2009. This joint agreement to continue the hearing beyond the 30-day period provided in 11 U.S.C. § 362(e)(1) reflects implicit consents by the secured creditors to not only waive the 30-day period of § 362(e)(1), but also to waive the 60-day period of § 362(e)(2)(B)(i).

**Hoeger's Appraisals – Ex. 16, 17, 18 & 19.**

Hoeger is an appraiser with MAI and ARA designations, and has been an appraiser since 1973. Hoeger was hired by the secured creditors to perform appraisals on 33 lots in RGR, and his appraisals were admitted as Ex. 16, 17, 18 and 19. Hoeger did not speak with Cavanaugh while preparing his appraisals. He testified that he did not think Cavanaugh would agree to speak with him, and that it is not common to talk to the owner in a manner involving a contested valuation.

Both Hoeger and Joki utilized the sales comparison approach in arriving at their valuation conclusions, and both declined to use the cost approach or the income capitalization approach because no improvements and no income producing property exist on the subject lots.

In analyzing the market at Ex. 16, p. 24, Hoeger considered listing prices as well as sale prices. Hoeger testified that the 7 lots he considered at page 24, including lot sales in Wheatland, averaged a decline from listing price of $47,900, which after he made a time adjustment for the market decline indicated to him a realistic drop in values for the 7 lots in RGR of $44,000.

Hoeger's sales comparison approach considered 8 sales and 1 listing, at pages 27 through 30 of Ex. 16[14]. Hoeger testified that, from sales data, he concluded lot values decreased by an average of 55% from 2007, with the most extreme decrease at 71% and the least decrease at 28%[15]. Ex. 16, pp. 23-24.

When asked about his reliance on "fire sale" prices for the Wheatland Lots 34 and 38,

---

[14]The same approach, except for the subject lots, is in Ex. 17 at pp. 30-33, Ex. 18 at pp. 31-34, and Ex. 19 at pp. 34-37.

[15]On cross examination Hoeger admitted that the 71% and 28% decreases were both in Wheatland.

13

which Joki described as misleading, Hoeger answered that an appraiser needs to consider all the market data.  On cross examination Hoeger did not agree that Wheatland "knocked the bottom out of the market" to generate sales.  He testified that Wheatland lowered their price for Lots 34 and 38 until people were willing to buy, while the DIP has not lowered its prices for lots in RGR enough to attract buyers.  Hoeger admitted that without the Wheatland sales his conclusion would not be as much as a 55% decline, but that he knows the market has declined since September 2007, and he would have to go somewhere else to see the relevant market.  Hoeger testified that he did not look at sales other than in Wheatland and RGR because other nearby subdivisions are smaller with smaller lots, and he had sales close by RGR so felt satisfied that he had enough data[16].

Hoeger testified that he used smaller lots from Wheatland for purposes of time adjustment in value, and he does not think that the value of small lots changes any more than the value of larger lots.  He testified that he did not compare the valuations of small Wheatland lots with RGR lots, and that he was not looking at value per acre but rather looked at the values of building sites.

On cross examination Hoeger testified that that he did not ignore the sale of RGR Lot 120, which is Joki's Comparable 1, but that he considers that sale an aberration of the market because it was only one sale, was the only sale in RGR since 2007, that the sale has not closed, and that it was based on anticipation of the amenities which the DIP lacks financing to complete. Hoeger testified that Lot 54 in RGR sold in 2007 for $138,900, and that it is now listed for sale

---

[16]Asked whether he criticized Joki for using comparable sales from Quiet Subdivision Hoeger answered: "Not at all" and that it was "absolutely" appropriate to consider sales from Quiet.

for $148,900. Ex. 16, pp. 27, 28. Joki and Cavanaugh disagreed and testified that Lot 54 sold at a 10% price concession in the amount of $125,010 (Comparable 2). Ex. A, pp. 28, 29. Joki testified that he used the $125,010 amount and came up with a 24% downward market adjustment from the 2007 sale price, while using $138,900 like Hoeger used gives a larger adjustment. Hoeger did not testify on rebuttal about the sale price of Lot 54. Lot 54 is currently listed at $148,900[17], or a 25.1% appreciation, but Joki testified that he does not believe any appreciation in the value of Lot 54 has occurred. Ex. A, pp. 25, 29. Joki testified that it is appropriate to use the listing price in appraisals, but answered "No" when asked if listing prices need to be adjusted.

Lot 75 of RGR sold in September 2007 for $97,500, which Hoeger states reflects a 30% decrease over a 6 month period. Ex. 16, p. 24. Hoeger gave the most weight to the sale of Lot 75 (Comparable Sale 3) and the sales of Lots 34 and 38 (Comparables 4 and 5) in Wheatland. Ex. 16, pp. 28, 30. Cavanaugh testified that the lower price for Lot 75 is because it overlooks a future subdivision of 192 homes on half acre lots, which concerns potential buyers about their views. Hoeger testified that the market has declined considerably since September 2007 and the value must be further adjusted downward for the present market.

In Ex. 16, pp. 30, 31, Hoeger valued Neu's collateral as follows: Lot 11 – $40,000; Lot 13 – $47,500[18]; Lot 44 – $40,000; and Lot 47 – $40,000, for a total value securing Neu's claims of $167,500. In Ex. 17, pp. 33 and 34, Hoeger valued Essex 400's collateral as $40,000 for Lots

---

[17]Cavanaugh testified that the higher listing price for Lot 54 is because of its unobstructed view overlooking a draw, where no future building can occur. Ex. D.

[18]Ex. 16, p. 30 states that Lot 13 is 6.36 acres, which Hoeger states increased its value.

19, 78, 118, 119, 120 and 125, and $32,500 for Lot 80[19], for a total value securing Essex 400's

claims of $272,500.  In Ex. 18, pp. 34 and 35, Hoeger valued Essex 500's collateral as $40,000

for Lots 10, 23, 24, 31, 43, 66, 69, 70 and 73, and $47,500 for Lot 12[20], for a total value securing

Essex 500's claims of $407,500.  In Ex. 19, pp. 37 and 38, Hoeger valued Boone 600's collateral

as $40,000 apiece for Lots 14, 15, 57, 58, 59, 60, 63, 64, 67, 68, 71 and 72, for a total value

securing Boone 600's claims of $480,000.

**Joki's Appraisal – Ex. A.**

Joki was hired by the DIP to perform appraisals of Lots 47, 70, 72 and 120 in RGR, for

which at least one lot is collateral for each of the named secured creditors[21].  He began his

inspection on April 1, 2009, and he valued Lots 47, 70, 72, and 120 as of April 29, 2009, in the

amounts of $93,500, 90,000, 90,000, and 93,500, respectively.  Ex. A, pp. 31, 32[22].

Joki used 7 comparable sales which are listed on page 28 and discussed through page 31

of Ex. A.  Comparable 1 is the pending sale of Lot 120 in RGR, and Comparables 2, 3, 4, and 5

are other sales of RGR lots which occurred in 2007.  Comparable 6 is a sale of two lots in

Morning Sky Estates.  Comparable 7 is a 2007 sale of a lot in Quiet Subdivision.  Joki testified

that these sales yielded better data for RGR lot values.  Joki gave most emphasis to Comparable

1, the pending sale of Lot 120, and the other comparable sales in RGR.  Ex. A, p. 30.  Under

---

[19]Ex. 17, p. 33 states that Lot 80 is smaller in size at 3.64 acres.

[20]Ex. 18, p. 34 states that Lot 12 is 6.36 acres in size.

[21]Lot 47 is part of Neu's security, Ex. 16.  Lot 70 is security for Essex 500, Ex. 18.  Lot 72 is security for Boone 600, Ex. 19.  Lot 120 is security for Essex 400, Ex. 17.

[22]Ex. A has two pages numbered 32.  Joki's appraisal values are on the latter page 32.

cross examination Joki testified that he did not think that the listing prices which are greater than recent sale prices are any good, and that he adjusted the 2007 sales down for time.

## DISCUSSION

The secured creditors' 4 motions to modify stay all are filed for both "cause" under § 362(d)(1), and under § 362(d)(2).

> Under 11 U.S.C. § 362(a), "[a] bankruptcy filing imposes an automatic stay of all litigation against the debtor." *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990) (citing 11 U.S.C. § 362(a)), except in those cases specifically enumerated in § 362(b). The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives debtors a breathing spell from creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits debtors to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove them into bankruptcy. S.Rep. No. 989, 95th Cong., 2d Sess. 54-55 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840-41.

*In re Mittlestadt*, 20 Mont. B.R. 46, 51 (Bankr. D. Mont. 2002), quoting *In re Westco Energy, Inc.*, 18 Mont. B.R. 199, 211-12 (Bankr. D. Mont. 2000).

This Chapter 11 case has been pending since July 2008. The DIP has submitted a Plan (Docket No. 46) which seeks to continue the development of RGR and make payments from the proceeds, but the DIP to date has not yet satisfied the requirements of 11 U.S.C. § 1125 for its disclosure statement, and no hearing has been set on confirmation of DIP's Plan.

As the party seeking relief, the secured creditors must first establish a prima facie case that cause exists for relief under § 362(d)(1). *United States v. Gould (In re Gould)*, 401 B.R. 415, 426 (9th Cir. BAP 2009); *Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 205 B.R. 196, 200 (9th Cir. BAP 1996). Once a prima facie case has been established, the burden shifts to the debtor to show that relief from the stay is not warranted under § 362(g)(2). *Gould*, 491 B.R. at

17

426; *Duvar Apt.*, 205 B.R. at 200.  Under 11 U.S.C. § 362(g), a creditor has the burden of proving that a debtor does not have equity in property, while the debtor has the burden of proof on all other issues to show that the stay should not be modified.  *Mittlestadt*, 20 Mont. B.R. at 52; *In re Hungerford*, 19 Mont. B.R. 103, 133-34 (Bankr. D. Mont. 2001).

As is often the case, the DIP contends under § 362(d)(2)(B) that the collateral is necessary for its effective reorganization.  *Hungerford*, 19 Mont. B.R. at 133-34.  The secured creditors do not appear to seriously contest that contention, and the loss of 33 lots in RGR undoubtedly would make the DIP's Plan to continue in operation less likely to be effective.  Assuming that the collateral is necessary for the DIP's effective reorganization, then it becomes unnecessary for the Court to determine whether the DIP has an equity in the collateral under § 362(d)(2)(A)[23].

Turning to § 362(d)(1), the secured creditors' motions to modify stay each contend that the DIP is in default of payments due under notes and security agreements since 2008.  The DIP's objections do not contest those contentions, and therefore the Court finds that the DIP is in default of post-petition payments to the secured creditors.

Next, the Court finds that the DIP's objections to the secured creditors motions fail to comply with the requirements of Mont. LBR 4001-1(b)(1) and (b)(3).  LBR 4001-1(b) requires in pertinent part:

The response and request for hearing must contain the following:

---

[23]The record does not contain sufficient evidence for the Court to make a determination of equity one way or the other.  In addition to the conflicting appraisals and expert opinions, no evidence exists in the record stating the amount of the unpaid property taxes, which the DIP admits are owed and which constitute a prior lien on the collateral.  Also alleged in the 4 motions are liens for SIA assessments in the amount of $10,500 per lot, which are the subject of pending adversary proceedings.

(1) If the valuation of property is an issue, the estimation of value asserted by the respondent.

\* \* \* \*

(3) If the respondent proposes to offer adequate protection, it must state with specificity the adequate protection offered to be provided (e.g., periodic payments, substitute liens, or other indubitable equivalents).

DIP's objections Docket Nos. 97, 98, 99, and 100 all fail to contain the DIP's estimation of value as required by LBR 4001-1(b)(1). They state that the "Debtor has equity in the collateral[,]" but that is not responsive and does not satisfy the requirement of LBR 4001-1(b)(1). In addition DIP's objections fail to comply with LBR 4001-1(b)(3). The objections state: "The Debtor is willing to pay adequate protection to the creditor in the event this Court determines there is not an adequate equity cushion in the collateral." LBR 4001-1(b)(3) requires a respondent to "state with specificity" any adequate protection offered. That requirement is to be satisfied in a response that notices a contested motion for hearing, not "in the event this Court determines there is not an adequate equity cushion" after a hearing. In addition, the Court finds that the DIP offered no evidence at the hearing of any proposed adequate protection payments to the secured creditors. The DIP offered no evidence that it has the ability to make any adequate protection payments to the creditors. The Court finds that the DIP's objections are not in compliance with LBR 4001-1(b)(1) and (b)(3).

Section 362(d)(1) allows for the granting of relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest[.]" This Court explained the standard for modifying the stay for "cause" under § 362(d)(1) in *Westco*:

19

Section 362(d), however, provides that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay" in three instances.  The subsection relevant to these proceedings is § 362(d)(1), which allows for the granting of relief from the automatic stay "for cause".  What constitutes cause for purposes of § 362(d) "has no clear definition and is determined on a case-by-case basis."  *Tucson Estates*, 912 F.2d at 1166.  *See also Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In the Matter of Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (Relief from the automatic stay may "be granted 'for cause,' a term not defined in the statute so as to afford flexibility to the bankruptcy courts.").

*Westco*, 18 Mont. B.R. at 211-12.

Section 362 vests this Court with wide latitude in granting appropriate relief from the automatic stay, and a decision to lift the automatic stay is within a bankruptcy court's discretion, and subject to review for an abuse of discretion.  *In re Delaney-Morin*, 304 B.R. 365, 369-70 (9th Cir. BAP 2003); *In re Leisure Corp.*, 234 B.R. 916, 920 (9th Cir. BAP 1999); *In re Plummer*, 20 Mont. B.R. 468, 477-78 (Bankr. D. Mont. 2003); *Mataya v. Kissinger (In re Kissinger)*, 72 F.3d 107, 108-109 (9th Cir. 1995).

As the party seeking relief the moving creditors must first establish a prima facie case that cause exists for relief under § 362(d)(1).  *Gould*, 401 B.R. at 426; *Duvar*, 205 B.R. at 200).  Once a prima facie case has been established, the burden shifts to the debtor to show that relief from the stay is not warranted. § 362(g)(2).  *Id.*

Lack of adequate protection is one example of cause for relief from stay.  *In re Ellis*, 60 B.R. 432, 435 (9th Cir. BAP 1985); *In re Avila,* 311 B.R. 81, 83 (Bankr. N.D. Cal. 2004).  An equity cushion may provide adequate protection even though not a single mortgage payment has been made.  *Avila,* 311 B.R. at 83; *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984).  In *Avila* the court found the mortgagee was adequately protected by an equity cushion of 40%.  311 B.R.

20

at 83.  The court noted that "[w]here a creditor is adequately protected by a large equity cushion,

the debtor would suffer a substantial loss in the event of foreclosure, and no economic harm to

the creditor would result, relief from stay should not automatically follow a default in payment."

*Avila*, 311 B.R. at 84; *see In re McCollum*, 76 B.R. 797, 799 (Bankr. D. Or.1987).

Ex. 16, 17, 18, and 19 set forth values for the secured creditors' respective collateral.  Ex.

16 values Neu's collateral (Lots 11, 13, 44, and 47) in the total amount of $167,500, which the

Court compares with the balance owing to Neu admitted by the DIP in Docket No. 117 in the

amount of $235,198.51.  Ex. 17 values Essex 400's collateral (Lots 19, 78, 80, 118, 119, 120 and

125) in the total amount of $272,500, which the Court compares with the balance owing to Essex

400 admitted by the DIP in Docket No. 117 in the amount of $398,590.24.  Ex. 18 values Essex

500's collateral (Lots 10, 12, 23, 24, 31, 43, 66, 69, 70 and 73) in the total amount of $407,500,

which the Court compares with the balance admitted by the DIP in Docket No. 117 of

$582,455.20.  Ex. 19 values Boone 600's collateral (Lots 14, 15, 57, 58, 59, 60, 63, 64, 67, 68,

71 and 72) in the total amount of $480,000, which the Court compares with the balance admitted

by the DIP in Docket No. 117 of $693,722.55.

Thus, with respect to all 4 motions the moving creditors have offered written MAI

appraisals and testimony which show that the amounts of their claims exceed the value of their

respective collateral, and that no equity cushion exists.  The Court notes that Hoeger's appraisals

have flaws, which will be discussed below.  Notwithstanding, based upon the secured creditors'

Ex. 16, 17, 18 and 19, together with the DIP's admitted defaults in post-petition payments to the

secured creditors, DIP's failure to comply with LBR 4001-1(b), the lack of any evidence of

adequate protection payments by the DIP and the undisputed decline in real estate sales in RGR

and the general market since 2007, as evidenced by both expert witnesses and/or their appraisals, the Court finds that the moving creditors have satisfied their burden to establish a prima facie case for relief from the stay under § 362(d)(1) for "cause," and the burden shifts to the DIP to show that relief from the stay is not warranted. § 362(g)(2). *Gould*, 491 B.R. at 426; *Duvar Apt.*, 205 B.R. at 200.

The DIP offered Joki's appraisal, Ex. A, which values 4 representative lots, one for each of the 4 contested motions. Ex. 16 values Lot 47 at $40,000, while Ex. A values Lot 47 at $93,500, a difference of $53,500. If all 4 lots securing Neu's claims are valued at $93,400 then the total value is $374,000 securing Neu's balance of $235,198.51, leaving a balance in the amount of $138,801.49. Ex. 17 values Lot 120 at $40,000, while Ex. A values Lot 120 at $93,500, also a difference of $53,500. If all 7 lots securing Essex 400's claim are valued at $93,500 then the total value is $654,500 securing Essex 400's balance of $398,590.34, leaving a balance in the amount of $255,909.66. Ex. 18 values Lot 70 at $40,000, while Ex. A values Lot 70 at $90,000. If all 10 lots securing Essex 500's claim are valued at $90,000 then the total value is $900,000 securing Essex 500's balance of $582,455.20, leaving a balance in the amount of $317,544.80. Ex. 19 values Lot 72 at $40,000, while Ex. A values Lot 72 at $90,000, a difference of $50,000.. If all 12 lots securing Boone 600's claim are valued at $90,000 then the total value is $1,080,000 securing Boone 600's balance of $693,722.55, leaving a balance in the amount of $386,277.45.

The Court does not view the above balances resulting from Joki's valuations as sufficient equity cushions to constitute adequate protection for the secured creditors' claims. First, as noted above unpaid property taxes in unknown amounts exist, which are prior liens against the RGR

22

lots, plus additional SIA assessment liens exist in undetermined amounts. These prior liens reduce any equity cushion for the moving parties, and the uncertainty and lack of evidence regarding their amounts weighs against the DIP as the party with the burden of proof under § 362(g)(2). Second, the DIP has offered no proof of adequate protection payments, and offered no proof of ability to make any adequate protection payments that could preserve any equity cushion. Third, if Joki's valuations are correct then the secured creditors are oversecured and thereby entitled under 11 U.S.C. § 506(b) to interest on their claims plus reasonable fees and costs. The DIP as the party with the burden of proof failed to offer any evidence or provision for payment of these additional components of the moving creditors' claims, and thereby failed its burden under § 362(g)(2) to show that the stay should not be lifted for cause under § 362(d)(1).

Turning to the appraisals, the Court begins by noting the different approaches taken by Hoeger and Joki. Hoeger stated an opinion on the value of each individual lot for which he estimated the value in Ex. 16, 17, 18 and 19, and in Ex. 16, 17 and 18 he arrived at a different value for Lots 12, 13 and 80 and explained the difference from the size of the lots. In Ex. A Joki valued Lots 47, 70, 72 and 120, one for each contested motion, and made no provision or discussion for the different size lots. In this Court's view, with so much at stake, Hoeger's approach in providing a separate value for each lot is the better approach.

From the evidence, Hoeger's appraisals all appear to contain an error in the sale price of Comparable Sale 2 of RGR Lot 54. Hoeger states the sale price as $138,900. Joki and Cavanaugh both testified that Hoeger made a mistake and that the sale price of Lot 54 on March 30, 2007, was $125,010 based on a price concession. Hoeger was not recalled to testify on rebuttal, and so it appears that his Comparable Sale 2 contains an error in the sale price, and as a

result Hoeger overstated his downward price adjustment.  On the other hand, that error is ameliorated because Hoeger gave "little consideration" to Sale 2 in arriving at his value estimates.  Ex. 16, p. 30.

With regard to the sale of RGR Lot 120 and other sales available in the surrounding subdivisions, except for his Comparable Sale 8 in Morning Sky Estates, the Court finds that Hoeger's refusal to consider such sales contrary to his testimony that an appraiser should consider all the market data.  Any uncertainty involving a particular sale can be addressed by determining the weight to give any particular sale, as both Hoeger and Joki did in their appraisals.

The Court disagrees with Joki that the sales of Wheatland Lots 34 and 38 in December 2008 were an aberration and were not sold for market value.  The sales were negotiated at arm's length for cash as a bulk sale, no evidence exists in the record of illegality or undue pressure, and the sales otherwise appear to satisfy the definition of market value Joki provided at Ex. A, p. 10. However, the Court also disagrees with Hoeger's decision to give the most weight to those sales at Ex. 16, p. 30 (Sales 4 and 5).  Hoeger was aware of and testified about the concerns, yet gave those 2 suspect sales the most weight along with the sale of RGR Lot 75.

The Court has the same problem with Joki's decision to give the most weight to the sale of RGR Lot 120, at page 30 of Ex. A.  The evidence shows that the sale of Lot 120 is pending, with no closing expected until the conclusion of these bankruptcy proceedings.  However, confirmation of the DIP's Plan is contested, and is not guaranteed.  Thus, the sale of Lot 120 for the sum of $93,500 under DIP's Plan may never close.  Joki's appraisal, Ex. A, states at page 10 in the definition of market value:  "Implicit in this definition is the consummation of a sale ...."

No sale of Lot 120 has been consummated[24].  Despite their problems, the sales of Wheatland Lots 34 and 38 which Joki found an aberration at least were consummated.

The determination of the weight to be given expert testimony or evidence is a matter within the discretion of the trier of fact – which in a bench trial like the instant case is the bankruptcy court. *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990); *Arkwright Mutual Insurance Co. v. Gwinner Oil Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997); Barry Russell, *Bankruptcy Evidence Manual*, 2000 Ed., § 702.2; 4 Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 702.05[2][a] (2nd ed. 2002).  Joki's decision to give the unconsummated sale of Lot 120 the most emphasis at page 30 of Ex. A detracts from the weight the Court gives his opinion.

Other evidence offered by the DIP about the amenities weighs against its burden under § 362(d)(1) and (g)(2).  Cavanaugh testified that the golf courses are not complete, that he does not own sufficient water rights and that he does not have access to the $354 million in capital to develop the RGR master plan over 40 years.  Cavanaugh testified that when the golf courses are complete the RGR lots will sell readily, but since the evidence shows that the DIP lacks water rights and capital to complete the amenities, the DIP has failed to offer any evidence why or when anyone, in this oversupplied and slow real estate market, would purchase lots in a subdivision with unpaved roads, which is being developed by a bankrupt debtor, at prices of $90,000 or $93,500 per lot as estimated at pages 31 and 32 of Ex. A.

The foregoing discussion reflects the problems encountered by the Court in trying to determine appropriate valuations for the subject collateral lots.  Not only is the developer in

---

[24]It is appropriate to note the buyers' reasons for the pending purchase of Lot 120 were in part for family reasons, to provide a living place for their parents.

25

bankruptcy and without access to capital to finish the amenities upon which the development depends for marketing, but the entire real estate market is suffering from a prolonged decline, and an oversupply in comparable properties exists such as in Morning Sky Estates or Quiet Subdivision shown on page 28 of Ex. A.

If the Court must estimate the value of the lots which are security for the moving creditors, because of the problems with the DIP, the development, and the market, the Court would fix the values at a range of not more than $55,000 to $60,000. At first glance that range of values could exceed the balances owed to the secured creditors on page 3 of Docket No. 117. However, taking into consideration the unknown and unpaid property taxes, undetermined county liens for SIA assessments, and lack of any provision for payment of adequate protection payments by the DIP, the Court finds that an insufficient equity cushion exists in the collateral to constitute adequate protection, and finds that a risk of economic harm to the moving creditors arises from further delay in allowing them to recover from their collateral.

Together with the DIP's default to the moving creditors in post-petition payments, the Court concludes that the DIP has failed to satisfy its burden of proof under § 362(g)(2) that the stay should be lifted for cause under § 362(d)(1). *Avila,* 311 B.R. at 84. Having found and concluded that the DIP failed to satisfy its burden of proof to show that relief from the stay should not be granted, the Court exercises its broad discretion and grants each of the 4 motions to modify stay. *Mataya v. Kissinger*, 72 F.3d at 108-109.

Granting relief from the automatic stay returns the parties to the legal position which they enjoyed prior to the imposition of the stay. *In re Johnson*, 17 Mont. B.R. 318, 319 (Bankr. D. Mont. 1999); *Estate of B.J. McAdams v. Ralston Purina Co.*, 154 B.R. 809, 812 (N.D. Ga. 1993).

26

Thus, while the Court has flexibility in determining whether to grant the moving creditors' motions to modify stay, by granting the motions the DIP retains whatever claims, defenses and remedies it may have in a nonbankruptcy forum.

## CONCLUSIONS OF LAW

1.  This Court has original and exclusive jurisdiction in this Chapter 11 bankruptcy case under 28 U.S.C. § 1334(a).

2.  The 4 pending motions to modify stay are core proceedings under 28 U.S.C. § 157(b)(2)(G).

3.  The moving creditors satisfied their initial burden under 11 U.S.C. § 362(d)(1) to show "cause" to lift the stay based on the DIP's default in post-petition payments, lack of adequate protection, and failure to comply with Mont. LBR 4001-1(b).

4.  The DIP failed to satisfied its burden of proof under 11 U.S.C. §§ 362(d)(1) and (g)(2) to show that relief from the stay should not be granted.

**IT IS ORDERED** separate Orders shall be entered in conformity with the above, (1) overruling the DIP's objections (Docket Nos. 97, 98, 99, and 100) and granting the 4 motions to modify stay filed by the moving creditors Neu, Essex 400, Essex 500 and Boone 600 on March 19, 2009 (Docket Nos. 86, 87, 88, and 89).

BY THE COURT

*Ralph B. Kirscher*

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

27

28